**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

Robert L. Fellows, individually and                              Index No.  07 Civ 2261
on behalf of all others similarly situated,                      (DLK) (KNF)

                              Plaintiff,                         Jury Trial Demanded

            - against -

CitiMortgage, Inc.,

                              Defendant.
-------------------------------------------------------------------x

## AMENDED CLASS ACTION COMPLAINT

Robert L. Fellows, by and through his attorneys, states as follows:

<u>Nature of the Action</u>

1.      In this class action, Plaintiff Robert Fellows asserts that Defendant's practices in

connection with the cancellation of private mortgage insurance ("PMI") on home

mortgages is violative of New York's Deceptive Trade Practices Act, N.Y. Gen.

Bus. L. §349, and is a breach of contract.  Mr. Fellows seeks classwide reliefs for

compensatory and punitive damages, and injunctive and declaratory reliefs,

together with attorneys' fees and expenses.

<u>Parties</u>

2.      Mr. Fellows is a citizen and resident of New York, residing in Rockland County.

3.      Defendant is, and has been at all relevant times, a New York corporation

providing home mortgage and home equity loans to consumers in New York.  In

previous Court filings in this case, Defendant has stated that it is a subsidiary of

Citibank, N.A., which is a subsidiary of Citicorp Holdings, Inc., which, in turn, is a

1

subsidiary of Citigroup, Inc.  According to public records (including, without

limitation, SEC filings of Citigroup, Inc.), Defendant holds a portfolio of billions of

dollars in mortgages which, upon information and belief, involved hundreds of

thousands, if not  millions of borrowers.

<u>Class Action Allegations</u>

4.      Mr. Fellows brings this action on behalf of a

a.      Class of all persons (a) whose mortgages were or are serviced by

Defendant during the Class Period[1] and (b) who were or are required to

pay premiums towards PMI on Federal National Mortgage Association

("Fannie Mae")[2] insured residential mortgages ("Class"); and

b.      Sub-Class of all persons (a) whose mortgages were or are serviced by

Defendant during the Class Period and (b) who were or are paying

premiums for PMI on Fannie Mae insured residential mortgages, and (c)

whose mortgages were or became 2 years old at any time during the

Class Period ("Sub-Class").  Unless the context requires otherwise,

"Class" as used herein includes the Sub-Class.

Excluded from the Class are Defendant, its officers, employees,

corporate parents, corporate subsidiaries, corporate affiliates,

---

[1]The Class Period is from February 22, 2001, to the present.

[2]Fannie Mae is a government-sponsored enterprise established as a federal
agency in 1938 in order to provide liquidity, stability and affordability to the U.S. housing
and mortgage markets.  While it does not make home loans directly to consumers, it
works with mortgage bankers, brokers and other primary mortgage market partners
such as Defendant to help ensure availability of affordable funds to home buyers.

agents, attorneys, accountants, affiliates, and/or representatives by whatever name called.

5.    The number of Class members is currently not known to Mr. Fellows, but is clearly larger than can be addressed through joinder.  Defendant is among the largest mortgage lenders/servicers in the United States, and a major purchaser of assignments of mortgages from other lenders/servicers.  Thus, the members of the Class are so numerous that joinder of all members is impracticable.  The identity and whereabouts of all Class members are known to Defendant, and can be readily ascertained from their records.

6.    Common questions of law and fact predominate in this action including, but not limited to, the following:

a.    Whether Defendant violated New York Deceptive Practices Act, N.Y.G.B.L. §349;

b.    Whether Defendant committed breach of contract;

c.    Whether the Class should receive prospective declaratory and injunctive relief; and

d.    Whether the Sub-Class is entitled to compensatory and/or punitive damages; and

e.    The measure of such damages.

7.    Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication.  Individual litigation of these claims would be impractical and would impair the ability of Class members to protect their

3

interests.

8.     Defendant has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Mr. Fellows and the Class as a whole. Class members are entitled to injunctive relief to end Defendant's common, uniform, and deceptive practices and breach of contract at issue.

9.     Mr. Fellows's claims are typical of those of the Class.

10.    Mr. Fellows's interests do not conflict with those of the Class.

11.    Mr. Fellows will fairly and adequately represent the Class, and has retained competent counsel experienced in class action litigation.

12.    Mr. Fellows is not aware of any other proceeding arising out of the issues in this action.

13.    This Court is the appropriate forum for the instant action.  Mr. Fellows and Defendant are both New York residents and citizens.  Upon information and belief, Defendant's headquarters is in New York, and the policies and practices at issue originated from here.  The underlying transaction took place in New York, and is governed by New York law.

14.    Mr. Fellows anticipates no difficulty in the management of this class action.

15.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class members are entitled to declaratory and injunctive relief.  Sub-Class members have been damaged and are entitled to recovery as a result of Defendant's common, uniform, and unfair practices. Although this suffices for certification of the Class and Sub-Class for liability

4

purposes, even the damages can be determined and appropriately addressed through this class action because compensatory damages are relatively small in comparison to the costs and expenses of litigation.   Upon information and belief, Defendant has computerized data on the mortgages and PMI premium payments that will make calculation of damages for individual Sub-Class members a relatively simple ministerial task. The propriety and amount of punitive damages are also common issues.

Factual Background

The September 3, 2003 Purchase

16.    On or about September 3, 2003, Mr. Fellows purchased real estate property ("Property") in New York for $225,000.

17.    In accordance with customary practice, Mr. Fellows sought to finance this transaction through a mortgage.  For this purpose, he filled out a Uniform Residential Mortgage Application (Form 1003) of Fannie Mae, for a Fannie Mae insured residential mortgage, in order to borrow the requisite amount from HSBC, a Fannie Mae lender.

18.    HSBC accepted the application and approved the transaction.   Accordingly, Mr. Fellows obtained a mortgage of $213,750 from HSBC Mortgage Corporation (USA) ("Mortgage").  The Mortgage was a Fannie Mae insured residential mortgage.

The Fannie Mae/Freddie Mac Mortgage, Fannie Mae's PMI Requirements

19.    On the face of the Mortgage, the following printed statement appeared (emphasis in original):

**NEW YORK** - Single family - **Fannie Mae/Freddie Mac**
**UNIFORM INSTRUMENT**    Form 3033 1/01

20.    Every page of the Mortgage carried a footer which read, "**Form 3033 1/01"**

(emphasis in original)**.**

21.    Upon information and belief, the same form is used all over New York by all

Fannie Mae lenders.

22.    Because the loan to value ("LTV") ratio for the Mortgage was below 80%, Fannie

Mae guidelines required that Mr. Fellows purchase PMI.  These guidelines

mandate the purchase of PMI in such cases as a precondition for the purchase

of the mortgage loan in the secondary mortgage market.  Since home mortgages

are routinely purchased by Fannie Mae, this PMI requirement is unvarying.

23.    PMI is an insurance policy issued to the lender.  It is designed to protect the

lender  (or its successor-in-interest) against the risk of loss in the event of default

by the borrower if the value of the unpaid balance of the loan exceeds the value

of the mortgaged property at foreclosure. The insurance is meant to benefit

borrowers by enabling them to borrow a greater percentage of the purchase

price, thereby reducing the amount of down payment required and bringing the

price of home ownership within the reach of more people.  Because of the 80%

LTV cap that would exist without such insurance, PMI enables borrowers who

would not have otherwise qualified for mortgages to purchase homes.[3]

24.    Lenders routinely sell the loans on the secondary mortgage market. After the

---

[3]This appears to be in furtherance of Fannie Mae's mission "to increase the amount of funds available in order to make homeownership and rental housing more available and affordable," http://www.fanniemae.com/about/index.html.

loan is sold, it is serviced either by the lender that originated the loan or by another Fannie Mae servicer. The two largest investors in the secondary mortgage market are Fannie Mae and Freddie Mac.[4]

25. Since the LTV for Mr. Fellows' mortgage was above 80%, HSBC required, consistent with Fannie Mae requirements, that Mr. Fellows obtain PMI to insure against a default on the Mortgage. Accordingly, Mr. Fellows was required to, and did, purchase such insurance, and pay a PMI premium of $138.94 every month, i.e., a total of $1,667.28 per year, in addition to the regular mortgage payments.

26. Mr. Fellows and HSBC intended and understood that the loan would be serviced in accordance with Fannie Mae guidelines and/or rules.

27. The Mortgage specifically provided that HSBC's agreements with third parties would not affect Mr. Fellows' rights concerning PMI, whether under "the Homeowners Protection Act of 1998 or any other law." Further, it expressly provided that these rights "may include the right to (a) receive certain disclosures, (b) to request and obtain cancellation of [PMI], (c) to have [PMI] terminated automatically, and/or (d) to receive a refund of any [PMI] premiums that were not earned at the time of such cancellation or termination." Form 3033 1/01 at 10¶10.

28. Thus, the Mortgage itself specifically excluded from its coverage, and did not address, Mr. Fellows' rights concerning PMI. Instead, it left Mr. Fellows' PMI rights open, and authorized and permitted enforcement of PMI rights from other

---

[4]Upon information and belief, Freddie Mac's guidelines are similar to those of Fannie Mae.

sources, providing only that such rights under federal and state law would be unaffected by the Mortgage.

29.    Further, the Mortgage was a Fannie Mae document, which specifically referred to rights to "request and obtain cancellation of" PMI - which rights were clearly enunciated under Fannie Mae Servicing Guidelines and mandated to be followed by servicers.  Hence, the Mortgage intended and contemplated to benefit Mr. Fellows' through rights under those Servicing Guidelines, which HSBC was bound to observe.

Assignment of Mortgage to Defendant, Mr. Fellows' Good Payment History

30.    HSBC was a Fannie Mae lender.  Upon information and belief, HSBC promptly sold Mr. Fellows' mortgage loan to Fannie Mae, but remained the servicer thereof.

31.    By a Corporate Assignment of Mortgage dated April 7, 2004, HSBC assigned the Mortgage to Defendant for servicing.

32.    Defendant is also a Fannie Mae lender, and hence, is required to comply with Fannie Mae servicing requirements.  Defendant expressly represents that it complies fully with Fannie Mae guidelines and/or rules.

33.    From May 2004, Mr. Fellows made his monthly Mortgage and PMI payments to Defendant.

34.    Mr. Fellows was prompt and punctual in his payments on the Mortgage.

Fannie Mae Requirements For Cancellation of PMI

35.    Fannie Mae permits a borrower (such as Mr. Fellows) to seek cancellation of PMI "based on the current appraised value of the property."  Fannie Mae Servicing

8

Guidelines, Part II, Ch. I, Sec. 102.05.  For cancellation, the LTV ratio should be 80% or less for mortgages that are over 5 years old, or 75% or less for mortgages that are 2 years old.  In case capital improvements have been made, cancellation may take place even where the mortgages are less than 2 years old.

36.    Upon receipt of such a cancellation request, Fannie Mae mandates cancellation of PMI if the requisite conditions are met:

> If the borrower's written request for cancellation includes all of the information necessary to reach a decision about the cancellation, the servicer should determine whether the loan-to-value ratio of the mortgage meets our eligibility criterion and whether the borrower has an acceptable payment record.  The servicer **must** cancel the mortgage insurance if the borrower has an acceptable payment record and the servicer is satisfied that the mortgage meets the applicable loan-to-value ratio eligibility criterion (as evidenced by the **new appraisal**).

*Id*. (Emphasis added).

37.    Further, Fannie Mae mandates that the LTV ratio is determined by "dividing the outstanding balance of the mortgage by the current appraised value of the property."

38.    So also, under Fannie Mae's definition, a borrower has "an acceptable payment record" if he/she is current at the time of the request, "has had no payment 30 days or more past due in the 12 months preceding the date that the mortgage insurance will be canceled, and has had no payment 60 days or more past due in the 24-month period preceding that date." *Id*.

39.    Fannie Mae reiterates the mandatory nature of this provision requiring PMI cancellation:

9

> If our applicable loan-to-value (or combined loan-to-value) ratio eligibility criterion is met and the borrower has an acceptable payment record, the servicer **must** approve the request for cancellation. The effective cancellation date should be the date on which the servicer determines that all eligibility criteria for cancellation have been satisfied.

*Id.* (Emphasis added).

40.    In all such cases, Fannie Mae mandates that the servicer "may not collect mortgage insurance premiums as part of the borrower's mortgage payment more than 30 days after" receiving the request for cancellation or "the date on which all eligibility criteria for cancellation were satisfied." *Id.* (Emphasis added). Thus, Fannie Mae clearly contemplates that PMI may be cancelled on the second anniversary of the loan origination.

41.    Defendant's contract with Fannie Mae expressly provides that Fannie Mae mortgages - such as Mr. Fellows' Mortgage -

> must be serviced by [Defendant] according to the provisions in our Guides that are in effect on the date of this Contract or as amended in the future. This is true regardless of when:
> ● the mortgage was originated;
> ● the mortgage or a participation interest in it was transferred to us; or
> ● the Lender began servicing the mortgage.

Mortgage Selling and Servicing Contract, at 8¶V(A)(3).

Defendant's Misleading Notice Concerning PMI Cancellation

42.    Defendant routinely sent a notice to Mr. Fellows and Class members concerning such members' right to cancel PMI. Upon information and belief, such notice is sent annually to all members.

43.    This notice was materially misleading with respect to Class members'

10

(borrowers') right to seek cancellation of PMI.  Thus, Defendant did not notify

Class members that they could seek cancellation upon proof of structural

improvements irrespective of when the Mortgage was taken.  It also did not notify

Class members that they could seek cancellation based upon **current** appraised

value upon the Mortgage becoming 2 years old, and the borrower having an

"acceptable payment record."

44.    Defendant sent a copy of such a notice to Mr. Fellows after it assumed his

Mortgage.

<u>Mr. Fellows' Request for Cancellation, Defendant' Refusal</u>

45.    In early 2005, Mr. Fellows requested Defendant to delete the PMI requirement

with effect from September 2005, *i.e.*, when the Mortgage became 2 years old.

Defendant responded with a standard form letter that Mr. Fellows could

> request a review of [his] account when [his] principal balance
> has been reduced to 80% of the original value of [his]
> [P]roperty ($225,000 x 80%= $180,000).
> **********        **********        **********
> There can be no payment defaults (over thirty (30) days late)
> within twelve (12) months of your request and your property
> must remain owner-occupied.

Letter of March 30, 2005.

46.    By another standard form letter of the same date, Defendant denied Mr. Fellows'

request for PMI cancellation on the ground that he did not have a "minimum" 2

year payment history, and his request was not accompanied by a Defendant-

approved appraiser's report.  Defendant's representatives clarified that the 2

year payment history was not from the **origination** of the Mortgage, but from the

date that Defendant **assumed** it.  This was directly contrary to Defendant's contract with Fannie Mae.

47.     Mr. Fellows objected, and requested that the 2-year period be computed from origination, i.e., the date of the Mortgage, not the date of Defendant's assumption thereof.  This request was in accordance with Fannie Mae's contract with Defendant, and with Fannie Mae Servicing Guidelines.

48.     However, by letter dated May 27, 2005, Defendant denied Mr. Fellows' request, asserting that "a two (2) year payment history is required **before** ordering a current CitiMortgage, Inc.[,] approved appraisal" (emphasis added).  In other words, the loan had to be 2 years old **with Defendant** before it would even consider ordering an appraisal which could eventually lead to cancellation of PMI several weeks or months later.  Meanwhile, Defendant would continue billing and collecting PMI premiums from Mr. Fellows (and Class members), in direct contravention of Fannie Mae guidelines and rules.

49.     Defendant also informed Mr. Fellows by that letter that alternatively, he could submit a "detailed list" of all "structural improvements" he made to the Property, excluding repairs or maintenance, with evidence of costs of such improvements. If Defendant's Underwriting Department "agrees to allow" an appraisal of the improvements, Defendant would send Mr. Fellows "information on how to obtain this new appraisal."  The appraisal would not take any capital appreciation into account, only improvements, wrote Defendant.

50.     Meanwhile, Mr. Fellows obtained an appraisal of the Property by a duly licensed

12

appraiser.  That written appraisal valued the Property at $340,000,[5] well above

the 75% LTV threshold that Defendant and Fannie Mae required.

51.    Mr. Fellows was, and continues to be, current in his monthly payments under the

Mortgage.  He had never been late in a single one of his payments, and had

never been assessed late fees, penalties, or any other charge for delayed

payment.

52.    Accordingly, he objected to Defendant's rejection of his request for cancellation

of PMI.  He forwarded a copy of the said appraisal, and requested Defendant to

delete the PMI requirement, once again.

53.    By letter dated August 8, 2005, Defendant once again denied Mr. Fellows'

request:

> Your loan is less than 2 years old.  In order to cancel PMI
> based on the current value of your property, you must have
> made improvements to your property since your loan closed
> that have substantially increased the property value.  Please
> provide us with an itemization of improvements made since
> your loan closed and an estimated dollar value of each
> improvement.

54.    Thus, Defendant consistently and repeatedly bypassed Mr. Fellows' request,

which was to terminate PMI in September 2005, when the Mortgage would be 2

years old.

55.    As a result, Defendant continued to bill, and collect PMI premium payments from

Mr. Fellows even after September 2005.

56.    In January 2007, Mr. Fellows reiterated his request to Defendant to terminate the

_____

[5]This value was by the sales comparison method.  By the cost method, the same
appraisal valued the Property at $366,200.

PMI.  Thereupon, Defendant acknowledged once again, that PMI cancellation was governed by Fannie Mae guidelines, and summarized the Fannie Mae requirements for cancellation of PMI.  Defendant confirmed that when a mortgage was 2 years old, PMI could be terminated upon evidence of the current appraised value of the property.

57.    Mr. Fellows once again wrote to Defendant requesting cancellation of the PMI.  However, by letter of May 4, 2007, Defendant rejected Mr. Fellows' request once again.  According to them, the Property was appraised at a current value of barely $240,000.

58.    Defendant's appraisal was over $100,000 less than the appraisal by HSBC and that too, 2 years earlier.  In view of the structural improvements made by Mr. Fellows, and capital appreciation of property during that time, it is clear that Defendant under-valued the Property in order to avoid cancellation of PMI, and continue profiting therefrom at Mr.  Fellows' expense.

59.    Upon information and belief, Defendant has a systematic practice and policy of under-valuing properties.  This enables Defendant to continue collecting PMI, avoid cancellation thereof, and profiting therefrom.

60.    Meanwhile, Defendant has collected, and continues to collect from Mr. Fellows the sum of $138.94 every month towards PMI premiums, i.e., a total of $1,667.28 per year, which collection ought to have ceased on September 2, 2005.[6]

---

[6]It is unclear whether Defendant is self-insured, and collects the PMI premiums for itself, or it is a servicing agent for PMI and collects the premiums for another insurer.

## COUNT I

(Section 349, Gen. Bus. L)

61.    Mr. Fellows repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

62.    This claim is brought individually on behalf of Mr. Fellows as well as on behalf of the Class and Sub-Class.

63.    As set forth above, Defendant billed and collected from Mr. Fellows and Class members, and compelled them to pay PMI premiums in contravention of the terms of Fannie Mae Guidelines.

64.    Further, Defendant' billing Mr. Fellows and Class members for PMI premiums was misleading and deceptive.  Such billing misled (and continues to mislead) Mr. Fellows and Sub-Class members that they were required to pay PMI premiums, even after Mr. Fellows' and Sub-Class members' principal balance dropped below the requirements for cancellation under Fannie Mae guidelines. Defendant ought to have informed Mr. Fellows and Sub-Class members, at the time their mortgages were about to become 2 years old, of their right to have the PMI terminated by simply having an appraisal of current value.  Defendant failed to do so, and continued to collect the PMI and to reap financial benefits therefrom.

---

In either case, it is indisputable that Defendant benefits financially from the PMI payments.  Even if Defendant is the servicing agent for another insurer, it presumably collects commissions and/or service charges for such collection.  Defendant's failure/refusal to inform Mr.  Fellows and Class members promptly and adequately of their right to terminate the PMI was thus motivated by the sole purpose of profiting itself at the expense of Mr. Fellows and Class members.

65.     This conduct has been expressly declared to be a deceptive practice under Section 349, G.B.L., several years ago by the Appellate Division of the Supreme Court of New York.  *Walts v. First Union Mortg. Corp.*, 259 A.D.2d 322.  Thus, Defendant' continuance of this practice was wilful, and subject to treble damages under Section 349.

66.     Defendant's practices and policy effectively negated <u>any</u> possibility, under any circumstances, of PMI being canceled at the second anniversary of loan origination.

67.     Defendant's practice and policy of considering the date <u>Defendant acquired</u> the mortgage, rather than the date the mortgage was <u>originated</u>, for purposes of PMI cancellation was unfair, deceptive, and illegal.  Indeed, this practice, if permitted, would permit lenders such as Defendant to keep charging PMI by simply exchanging with other lenders mortgages subject to PMI just prior to the 2nd anniversary of origination, acquisition, or assignment.

68.     Defendant also systematically under-valued properties subject to PMI in order to avoid cancelling PMI, and to continue profiting therefrom.

69.     Defendant' conduct was consumer-oriented, and affected the public at large.

70.     Accordingly, Mr. Fellows requests that the Court award judgment and relief against Defendant as sought herein including without limitation, compensatory and punitive damages, attorneys' fees and expense, and all such legal and equitable remedies to which Mr. Fellows and the Class are entitled under Section 349.

COUNT II

(Breach of Contract)

71.   Mr. Fellows repeats and realleges each and every allegation set forth in all of the foregoing paragraphs as if fully set forth herein.

72.   This claim is brought individually on behalf of Mr. Fellows as well as on behalf of the Class and Sub-Class.

73.   The Fannie Mae guidelines and mandates are part of the contract between Fannie Mae insured mortgagors and mortgagees (and their successors in title). Defendant' predecessor in title, HSBC, used a mortgage form that contains the statement: **"Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT"** (emphasis in original).  The Mortgage was based on documents which were standard form Fannie Mae prescribed.  Such use was not compulsory.  HSBC chose to use the form and Defendant, as HSBC's successor-in-title, is bound by the terms contained therein.  That standard form includes and incorporates the special single family residential mortgage servicing policies and practices adumbrated by Fannie Mae, and which were and are easily accessible to all borrowers whose loans include the disclosures at the public websites: www.fanniemae.com and www.freddiemac.com, of which this Court can take judicial notice.

74.   The printed part of the mortgage form that contains the aforesaid disclosure is a part of the Mortgage and as binding upon Defendant as every other part of the Mortgage.

75.   By using Fannie Mae's standard form, and representing that this was a Fannie

Mae mortgage, the Mortgage became subject to specialized loan servicing practices made applicable to Mr. Fellows and the Mortgage pursuant to Defendant' own servicing policies and practices and also pursuant to and in accordance with the loan servicing obligations established by Fannie Mae and Freddie Mac that are accessible online to the world.

76.    Defendant have acknowledged that PMI cancellation on the Mortgage is governed by "federal regulations and investor policies." Since the Mortgage is a Fannie Mae insured residential mortgage, Fannie Mae guidelines constitute investor policy which Defendant are obligated to follow. Defendant have admitted that they follow and implement such policy, and terminate PMI in accordance therewith.

77.    At the very least, Mr. Fellows was an intended third party beneficiary of Defendant's contract with Fannie Mae. As already seen, the Mortgage expressly refrained from addressing Mr. Fellows' PMI rights by itself, but preserved such rights found elsewhere, including Fannie Mae Servicing Guidelines.

78.    Mr. Fellows' PMI ought to have been canceled by Defendant in accordance with Fannie Mae guidelines. By refusing to cancel the PMI when the Mortgage was 2 years old, and the Property's appraised value well above the 75% LTV, Defendant committed a breach of contract.

79.    Defendant' practices in connection with PMI cancellation necessarily cause, and have been causing, Class members to be compelled to pay PMI premiums in direct contravention of Fannie Mae mandates, and are in breach of contract.

80.    Further, Defendant' failure to inform Mr. Fellows and Class members of their

18

right to initiate PMI cancellation, and refusal to cancel Mr. Fellows' PMI on September 3, 2005, was a breach of their implied covenant of good faith and fair dealing underlying the Mortgage and loan contract. Due to such breach, Mr. Fellows and Class members were and continue to be denied the benefit of PMI cancellation in accordance with Fannie Mae rules.

81. Moreover, given the express disapproval of this practice by New York's appellate court several years ago, Defendant' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable. Defendant are thus liable for punitive damages under New York law.

82. Accordingly, Mr. Fellows requests that the Court award judgment and relief against Defendant as sought herein including without limitation, compensatory and punitive damages, attorneys' fees and expense, and all such legal and equitable remedies to which Mr. Fellows and the Class are entitled for breach of contract.

<u>JURY TRIAL DEMAND</u>

83. Mr. Fellows and the Class demand a trial by jury on all issues so triable.

WHEREFORE, Mr. Fellows and the Class demand judgment and prays for relief against Defendant as follows:

a. Determining that the instant action be maintained as a class action pursuant to Article 9, CPLR, and appointing Mr. Fellows to be the Class Representative, and Chittur & Associates, P.C., to be Class Counsel;

b. awarding compensatory and/or treble damages to Mr. Fellows and

members of the Class and Sub-Class in such amount as may be determined after discovery and trial, under Section 349, N.Y. Gen. Bus. L.;

c.       awarding compensatory and/or punitive damages to Mr. Fellows and members of the Class and Sub-Class in such amount as may be determined after discovery and trial, for their unlawful, deliberate and intentional breach of contract;

d.       awarding appropriate declaratory and injunctive relief against Defendant;

e.       awarding Mr. Fellows and Class members the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements;

f.       for such further and other reliefs as may be just and proper..

Dated:  New York, New York
         July 31, 2009

# Chittur & Associates, P.C.

/s/
_____
Krishnan S. Chittur, Esq. (KC 9258)
286 Madison Avenue Suite 1100
New York, NY 10017

Tel: (212) 370-0447

Attorneys for Plaintiff Robert Fellows
and the Class

20